**No. 23-2402**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

---

FIVE-STAR AUDIOVISUAL, INC., an Illinois corporation,

Appellant,

*v.*

PNC BANK, NATIONAL ASSOCIATION, a National
Bank Association and PNC EQUIPMENT FINANCE, LLC,
a Delaware limited liability company,

Appellees.

---

Appeal from Memorandum Opinion and Order of the Hon. Virginia M. Kendall,
United States District Judge, Granting Plaintiffs'/Counter-Defendants' Motion to
Dismiss Amended Counterclaims, Case No. 1:21-cv-05419 (United States District
Court for the Northern District of Illinois, Eastern Division)

---

**APPELLANT'S BRIEF**

---

Paige M. Willan
pwillan@klehr.com
Christopher J. Leavell
cleavell@klehr.com
Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103

*Counsel for Appellant Five-Star Audiovisual, Inc.*

## Disclosure Statement

Pursuant to 7th Cir. R. 26.1, Five-Star Audiovisual, Inc. makes the following

disclosures:

**1.**     The full name of every party that the attorney represents in this case:

Five-Star Audiovisual, Inc.

**2.**     The names of all law firms whose partners or associates have appeared for the
party in the case or are expected to appear for the party in this Court:

Klehr Harrison Harvey Branzburg LLP; Lubin Austermuehle, P.C.; Clingen,
Callow & McLean LLC

**3.**     If the party or amicus is a corporation:

    (a)     Identify all its parent corporations, if any:

    None.

    (b)     List any publicly held company that owns 10% of more of the
party's or amicus's stock:

    None.

Dated: October 2, 2023

                 /s/ *Paige M. Willan*
                 KLEHR HARRISON HARVEY
                 BRANZBURG LLP
                 Paige M. Willan
                 Christopher J. Leavell
                 1835 Market St. Ste.  1400
                 Philadelphia, PA 19103
                 Telephone: (215) 569-2700
                 Email: pwillan@klehr.com
                 Email: cleavell@klehr.com

                 *Counsel for Defendant-Appellant*
                 *Five-Star Audiovisual, Inc.*

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................ ii

I.      Jurisdictional Statement ............................................................... 1

   A.   Jurisdiction of the District Court ............................................. 1

   B.   Jurisdiction Of The Court Of Appeals ..................................... 2

II.     Statement of Issues ...................................................................... 3

III.    Statement of the Case .................................................................. 3

   A.   PNC Bank Solicits Five-Star to Obtain a PPP Loan ............... 4

   B.   Five-Star Enters into the Sweep Rider .................................... 5

   C.   PNC Bank Breaches its Obligations to Five-Star .................... 7

   D.   Procedural Background ............................................................ 7

IV.     Summary of Argument .................................................................. 8

V.      Argument ...................................................................................... 9

   A.   Standard of Review Applicable to All Issues ........................... 9

   B.   The District Court Erred in Dismissing Five-Star's Breach of Contract Claim Based on the Sweep Rider ................................... 10

      (1)   The PPP Note and the Sweep Rider Should Not Be Read Together Under Delaware Law ................................................ 11

      (2)   The Plain Language of the PPP Note and the Sweep Rider Does Not Permit Them to be Construed Together ................. 16

      (3)   The District Court's Dismissal of the Breach of Contract Claim Improperly Credited An Affirmative Defense ............. 17

   C.   Five-Star Sufficiently Alleged that PNC Bank Breached the PPP Note .... 19

   D.   The District Court Erred in Dismissing Five-Star's Fraud Claim, Because Five-Star Adequately Alleged the Element of Reliance ............................ 23

VI.     Conclusion .................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)........................................................................10

*Blattman v. Siebel*,
 2016 WL 1450946 (D. Del. Apr. 12, 2016) .....................................30

*CA, Inc. v. Ingres Corp.*,
 2009 WL 4575009 (Del. Ch. Dec. 7, 2009), *aff'd*, 8 A.3d 1143
 (Del. 2010) ..................................................................................13, 14

*Cent. States, SE & SW Areas Pension Fund v. Kroger Co.*,
 73 F.3d 727 (7th Cir. 1996) ........................................................15, 16

*Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*,
 166 A.3d 912 (Del. 2017) ...........................................................19, 20

*Comerica Bank v. Glob. Payments Direct*,
 2014 WL 3567610 (Del. Ch. July 21, 2014) ....................................11

*Doe v. GTE Corp.*,
 347 F.3d 655 (7th Cir. 2003) ...........................................................17

*Fla. Chem. Co. v. Flotek Indus., Inc.*,
 262 A.3d 1066 (Del. Ch. 2021) ............................................11, 19, 21

*Genesis Health Ventures, Inc. v. Goldman, Sachs & Co.*,
 355 B.R. 438 (Bankr. D. Del. 2006)............................................23, 25

*Great Lakes Chemical Corp. v. Pharmacia Corp.*,
 788 A.2d 544 (Del. Ch. 2001) ............................................28, 29, 30

*Home Ins. Co. v. Chicago & NW Transp. Co.*,
 56 F.3d 763 (7th Cir. 1995) ........................................................10, 12

*Huston v. Hearst Commc'ns, Inc.*,
 53 F.4th 1097 (7th Cir. 2022) .............................................................9

*Kennedy v. Venrock Assocs.*,
    348 F.3d 584 (7th Cir. 2003) .........................................................................26, 27

*Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*,
    800 F.3d 343 (7th Cir. 2015) .................................................................................11

*NewSpin Sports, LLC v. Arrow Elecs., Inc.*,
    910 F.3d 293 (7th Cir. 2018) ...................................................................................9

*Page v. Democratic Nat'l Comm.*,
    2 F.4th 630 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 776 (2022) ....................1, 2

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) ...................................................................................17

*United Cent. Bank v. Kanan Fashions, Inc.*,
    2011 WL 686810 (N.D. Ill. Feb. 18, 2011) .....................................................12, 13

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*,
    61 F. Supp. 3d 391 (D. Del. 2014)..........................................................................18

*Wachovia Bank v. Schmidt*,
    546 U.S. 303 (2006).................................................................................................1

**Statutes**

28 U.S.C. § 1291 ................................................................................................................2

28 U.S.C. § 1332(a) ......................................................................................................1, 2

Coronavirus Aid, Relief, and Economic Security Act.....................................*passim*

## I.  **Jurisdictional Statement**

### A.    Jurisdiction of the District Court

The U.S. District Court for the Northern District of Illinois exercised jurisdiction over this civil action, case no. 1:21-cv-05419, pursuant to 28 U.S.C. § 1332(a)(1). PNC Bank, National Association ("Plaintiff" or "PNC Bank") is a national banking association that maintains its principal offices and place of business in Pittsburgh, Pennsylvania.[1] For purposes of diversity jurisdiction, PNC Bank is a citizen of Pennsylvania. *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006) (*citing* 28 U.S.C. § 1348) (national bank deemed to be citizen of the state where its principal office is located as set forth in its articles of association).

Plaintiff PNC Equipment Finance, LLC ("PNCEF") is a limited liability company established in the State of Delaware that maintains its principal offices and place of business in Pittsburgh, Pennsylvania. PNCEF's sole member is PNC Bank.[2] For purposes of diversity jurisdiction, PNCEF is a citizen of Pennsylvania. *See Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 636 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 776 (2022) (noting that a limited liability company's citizenship for diversity jurisdiction purposes is the citizenship of its members).

Defendant Five-Star Audiovisual, Inc. ("Defendant" or "Five-Star") is an Illinois corporation that maintains its principal offices and place of business in

---

[1]    A31.
[2]    A31.

Naperville, Illinois.  For purposes of diversity jurisdiction, Defendant is a citizen of Illinois.  *See Democratic Nat'l Comm.*, 2 F.4th at 635.

Complete diversity within the meaning of 28 U.S.C. § 1332(a) therefore exists as between Plaintiff and PNCEF on one hand, and Defendant on the other.  The amount in controversy is in excess of $75,000.00, exclusive of interest and costs.[3]

B.     Jurisdiction Of The Court Of Appeals

This appeal is taken from the Memorandum Opinion and Order of the U.S. District Court for the Northern District of Illinois by the Honorable Virginia M. Kendall, which was issued on June 16, 2023 (the "Order").  The Order dismissed with prejudice the amended counterclaims asserted by Defendant against Plaintiff. On June 23, 2023, Plaintiff and Defendant, by joint stipulation pursuant to Federal Rule of Civil Procedure 41(a)(1) (the "Joint Stipulation"), dismissed Plaintiff's affirmative claims[4] against Defendant with prejudice, leaving no further claims to be adjudicated by the District Court.  The District Court entered judgment based on the Joint Stipulation on July 28, 2023.

The Seventh Circuit Court of Appeals has jurisdiction to decide this case pursuant to 28 U.S.C. § 1291.

The Notice of Appeal was filed with the District Court on July 14, 2023.

---

[3] A33.

[4] The Joint Stipulation also dismissed with prejudice those affirmative claims asserted by plaintiff PNC Equipment Finance, LLC.  The counterclaims that are the subject of this appeal were asserted against PNC Bank only.

II.    **Statement of Issues**

    A.    Whether the District Court erred in dismissing Five-Star's breach of contract claim arising from an agreement under which PNC Bank extended a Paycheck Protection Program loan to Five-Star (the "PPP Note") by holding that the PPP Note must be read together with a prior agreement between the parties that allowed PNC Bank to sweep cash from Five-Star's operating account (the "Sweep Rider"), by holding that Five-Star failed adequately to allege a breach of the PPP Note, and by improperly crediting PNC Bank's affirmative defense.

    B.    Whether the District Court erred in dismissing Five-Star's claim for fraud, when Five-Star pleaded facts showing it reasonably relied on misstatements made by PNC Bank, and the PPP Note does not contain an anti-reliance disclaimer.

III.    **Statement of the Case**

    Five-Star, a company that provides audiovisual services and equipment for conferences and large events, experienced a near-total drop in revenue and a resulting liquidity crisis during the COVID-19 pandemic. A160. For several years prior to the pandemic, Five-Star had been a banking customer of PNC Bank. A161. During that relationship, PNC Bank extended more than $7 million in commercial financing to Five-Star, which timely repaid its loans and was never in default on its

3

obligations.  A161.  Despite the long-standing good relationship between Five-Star and PNC Bank, at the height of the pandemic, the bank swept desperately needed funds – that were provided by the federal government under an emergency relief program to be used for designated expenses – from Five-Star's operating account, thereby breaching one of its contracts with Five-Star.

A.     <u>PNC Bank Solicits Five-Star to Obtain a PPP Loan</u>

In March 2020, as the scope of the pandemic's impact became clear, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), thereby establishing the Paycheck Protection Program (the "PPP") to provide businesses like Five-Star with the liquidity necessary to retain as many employees as possible.  A162.  Congress permitted PNC Bank and other lenders to administer PPP loans, which gave PNC Bank the opportunity to earn substantial fees for making low-risk loans backed by the U.S. Small Business Administration.  A159.

The very day Congress established this program, a PNC Bank representative, Steven Preze, eagerly solicited Five-Star to obtain a PPP loan through PNC Bank. A162.  In that solicitation, Preze represented to Five-Star that seeking a PPP loan through PNC Bank would provide Five-Star with badly-needed cash at a low interest rate and with a deferred repayment period.  A163.  PNC Bank further represented to Five-Star that applying for a PPP loan specifically through PNC Bank would provide Five-Star with "every advantage" and that, after disbursement of the PPP funds, that

4

cash would be available to Five-Star to fund payroll and operating expenses, which Five-Star otherwise had no liquidity to cover. A163. Due to the emergency nature of the PPP, the application process was notoriously complicated for small businesses like Five-Star. A163. At PNC Bank's invitation, Five-Star relied on PNC Bank for assistance in navigating this complex, time-sensitive process. A163.

Five-Star succeeded in obtaining the PPP Loan, and executed a promissory note in connection with the loan on April 19, 2020. A165. Immediately before Five-Star executed the PPP Note, Preze assured Five-Star that funds from the PPP would be available for Five-Star to use for payroll and expenses the next week. A165. The PPP Note obligated PNC Bank to provide Five-Star with $2,906,800.00 in PPP funds "pursuant to [the CARES Act] Paycheck Protection Program" the ("PPP Loan"). A165. The PPP funds were to bear a 1% interest rate, be subject to a deferral period initially established at six months and later extended by law, and, if used only in accordance with PPP requirements, could be forgiven. A165. The PPP Note provides it was deemed to have been executed in Delaware, which law applies in interpreting its provisions absent contrary federal law. A167, 194.

B.    Five-Star Enters into the Sweep Rider

In late February and early March 2020, in connection with a pre-existing revolving line of credit in the amount of $2,750,000.00 (the "Line of Credit") unrelated to the PPP Loan, PNC Bank induced Five-Star to enter into a Working

Cash, Line of Credit, Investment Sweep Rider, which would permit PNC Bank to sweep funds from Five-Star's operating account to repay amounts drawn on the Line of Credit.  A164, 177-187.  PNC Bank described this arrangement as a significant benefit to Five-Star.  A164.

The Sweep Rider provided that when Five-Star's operating account balance exceeded a certain amount, PNC Bank would debit money out of the account to pay debts accrued under the Line of Credit.  A177-187.  Specifically, the Sweep Rider was "incorporated into and made part of that certain Amended and Restated Revolving Line of Credit Note dated February 7, 2020, as amended, restated or renewed from time to time . . . and also into certain other financing documents and security agreements executed by and between [Five-Star] and [PNC] (the Note together with all such documents are collectively referred to as the 'Loan Documents').  . . . Pursuant to the Loan Documents, [PNC] has extended a line of credit to [Five-Star], under which [Five-Star] may borrow, repay and reborrow funds at any time prior to the Expiration Date . . . ."  A177.

The Sweep Rider goes on to provide that "[a]s long as this Working Cash Sweep Rider has not been terminated, the following (i) outlines the terms under which [PNC] will make advances under the Line of Credit and (ii) supersedes any provision of the Loan Documents to the extent inconsistent therewith."  A177.  The contract contains a severability provision, which provides that any provision in the

6

Sweep Rider that is "invalid, illegal or unenforceable in any respect" will not affect the contract as a whole. A182.

C.    PNC Bank Breaches its Obligations to Five-Star

Despite its promises to provide Five-Star with PPP funds under the terms and conditions described in the PPP Note, PNC Bank instead immediately seized a substantial portion of the PPP funds for its own benefit. A159. Within mere hours of the deposit of the PPP funds in Five-Star's account, PNC Bank swept more than half of those funds and repaid itself certain outstanding amounts under the Line of Credit. A165. PNC Bank's failure to provide Five-Star with available cash on a low-interest, deferred payment basis as required by the PPP Note forced Five-Star to solve its liquidity crisis by drawing upon other sources of more expensive cash. A166. This breach of the PPP Note set off a cascade of negative impacts on Five-Star, causing substantial direct and consequential damages. A159. Although Five-Star confronted PNC Bank about its breach of contract, the bank refused to remedy its mistake, and instead aggressively pursued collection of the higher-cost financing upon which it had forced Five-Star to rely, resulting in this litigation. A166.

D.    Procedural Background

PNC Bank and PNCEF filed a complaint against Five-Star on October 13, 2021. A31. On December 3, 2021, Five-Star answered the complaint and filed counterclaims, which the District Court dismissed on September 28, 2022. On

October 21, 2022, Five-Star filed amended counterclaims (the "Counterclaims"). A158. On November 18, 2022, PNC Bank and PNCEF filed a motion to dismiss the Counterclaims. A202. On June 16, 2023, the District Court issued the Order dismissing the Counterclaims. A1. On July 14, 2023, Plaintiff filed a timely notice of appeal. A17.

**IV.**     **<u>Summary of Argument</u>**

The District Court erred when it dismissed Five-Star's breach of contract claim, because it mistakenly concluded that the PPP Note must be read together with the Sweep Rider. Under Delaware law, two agreements executed at different times to govern unrelated transactions should not be read together. Moreover, the plain language of the two agreements does not permit them to be construed as a single contract, because the Sweep Rider was only incorporated into prior – but not future – agreements between PNC Bank and Five-Star.

In determining that the Sweep Rider mandated dismissal of the breach of contract claim, the District Court mistakenly credited PNC Bank's affirmative defense, interpreting the interplay between the Sweep Rider and PPP Note in a way not permitted under Delaware law in the context of a Rule 12(b)(6) motion. The District Court further erred in concluding that Five-Star did not adequately allege a breach of the PPP Note, when Five-Star sufficiently pled at least three district breaches of the PPP Note committed by PNC Bank.

The District Court also erred in dismissing Five-Star's fraud claim, when Five-Star adequately alleged facts showing reasonable reliance on misstatements made by PNC Bank's representative, particularly given that the PPP Note did not contain any anti-reliance provision. Moreover, because the Sweep Rider had no bearing on or reference to the PPP Note, Five-Star reasonably understood that the PPP Note was either not governed by the Sweep Rider, or that the terms of the PPP Note modified the application of the Sweep Rider.

For these reasons, Five-Star respectfully requests that the Court reverse the order of the District Court dismissing its Counterclaims against PNC Bank for breach of contract and fraud, and remand this case to the District Court for further proceedings.

## V.  Argument

### A.  Standard of Review Applicable to All Issues

On appeal, this Court must review *de novo* the District Court's grant of a Rule 12(b)(6) motion to dismiss, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Huston v. Hearst Commc'ns, Inc*., 53 F.4th 1097, 1099 (7th Cir. 2022) (*citing Leszanczuk v. Carrington Mortg. Servs*., LLC, 21 F.4th 933, 937 (7th Cir. 2021)). To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *NewSpin Sports, LLC v. Arrow Elecs., Inc*., 910 F.3d

293, 299 (7th Cir. 2018) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

B.    The District Court Erred in Dismissing Five-Star's Breach of Contract Claim Based on the Sweep Rider

The District Court erred in dismissing Five-Star's breach of contract claim based upon the holding that:

> Viewed together, the terms of the Sweep Rider permitted PNC's sweep of the PPP funds, and nothing in the PPP Note limited the continued applicability of the Sweep Rider to funds deposited in Five-Star's operating account.

A5. The District Court further held that the Sweep Rider was an "unambiguous contract" and that PNC Bank was entitled to "enforce its contract to the letter." As a matter of law, however, the Sweep Rider and the PPP Note should not be read together. Nor does the plain language of either agreement mandate that the two contracts be read in tandem. Moreover, the dismissal of Five-Star's breach of contract claims based upon an affirmative defense of PNC Bank is procedurally improper. Accordingly, this Court should reverse the dismissal of Five-Star's breach of contract claim.

10

(1) The PPP Note and the Sweep Rider Should Not Be Read Together Under Delaware Law

Two agreements executed at different times to govern unrelated transactions should not be construed together.  Delaware courts read writings together where they are "part of the same transaction." *Fla. Chem. Co. v. Flotek Indus., Inc*., 262 A.3d 1066, 1081 (Del. Ch. 2021) (emphasis added). [5]  Under Delaware law, to read two agreements together, they must be: (1) contemporaneous; and (2) concern the same subject matter.  *Id*.; *see also Comerica Bank v. Glob. Payments Direct*, 2014 WL 3567610, at *7 (Del. Ch. July 21, 2014).  Similarly, this Court will not read separate agreements as a single contract, even when one expressly incorporates the terms of the other, where the agreements were not executed contemporaneously and were not related to the same transaction.  *Home Ins. Co. v. Chicago & NW Transp. Co*., 56 F.3d 763, 766-77 (7th Cir. 1995).  The PPP Note and the Sweep Rider do not meet the requirements to be read together as a matter of law.

In *Home Insurance*, this Court considered whether three contracts between Chicago and North Western Transportation Company ("CNW") and Metropolitan

---

[5] Pursuant to Section 14 of the PPP Note, the parties agreed that the contract will "be deemed to be made in the State of Delaware," and will be governed by Delaware law, to the extent federal law does not apply.  A194.  Where an agreement contains such a choice of law provision, Illinois courts apply the law of the state the parties selected.  *See Life Plans, Inc. v. Sec. Life of Denver Ins. Co*., 800 F.3d 343, 349 (7th Cir. 2015).  Delaware law therefore governs the substance of the breach of contract and fraud claims at issue in this appeal.  Even if this Court determines that Illinois, rather than Delaware, law applies to the substance of Five-Star's claims, however, Five-Star adequately pleaded its claims under the laws of either jurisdiction.

Rail-Metra ("Metra") were effectively a single contract. The three contracts included: an equipment purchase agreement dated June 1977, under which CNW sold commuter railroad equipment to Metra; an equipment lease dated December 1977, under which CNW leased the same equipment back from Metra; and a purchase of service agreement dated December 1976, under which CNW provided commuter transportation services for Metra. *Id*. at 765. Although the three contracts were between the same two parties, two pertained to the same railroad equipment, and the third referred to the two prior contracts, this Court determined that because they "were not executed contemporaneously or entered into in the course of the same transaction," the three agreements covered "three distinct legal relationships between Metra and CNW with distinct purposes." *Id*. at 766-77.

Courts within this Circuit accordingly have refused to read agreements together that were executed at different times and for different purposes; even when such agreements referred to each other. *See United Cent. Bank v. Kanan Fashions, Inc*., 2011 WL 686810, at *5-6 (N.D. Ill. Feb. 18, 2011). In *Kanan Fashions*, the plaintiff brought an action for breach of contract in connection with four loans made to defendants over a three year period, and sought partial judgment on the pleadings under Rule 12(c). *Id*. at *1. In response, defendants raised a so-called "one contract" defense, asking the court to find that the four contracts should be read together and

that, because plaintiff allegedly breached the first agreement, it also breached the three subsequent agreements, excusing defendants' performance. *Id*. at *5.

Because the four loan agreements were for different purposes and were entered into at different times, however, the court noted that "that admission alone calls for the same result that the Seventh Circuit reached" in *Home Insurance Company*. *Id*. at *6 (*citing Home Ins. Co*., 56 F.3d at 766-77). Here, the Sweep Rider and the PPP Note were not executed contemporaneously, and were not related to the same transaction. Like the loan agreements in *Kanan Fashions*, the PPP Note and the Sweep Rider should not be read together, and the District Court erred in dismissing the breach of contract claim on that basis.

Nor do the cases relied upon by the District Court for the proposition that "related documents must be read together" require the Sweep Rider and the PPP Note to be read in conjunction. A5. First, in *CA, Inc. v. Ingres Corp*., 2009 WL 4575009 (Del. Ch. Dec. 7, 2009), *aff'd*, 8 A.3d 1143 (Del. 2010), the court was presented with a dispute between two software companies, one of which was spun off pursuant to a suite of divestiture agreements. *Id*. at *1. The court needed to determine whether a choice of forum provision contained in a post-divestiture agreement superseded earlier agreements governing the divestiture. *Id*. at *47. In reaching its conclusion regarding the applicability of the choice of forum provision,

the court found that it must read the agreements together, because the later agreement was:

> [P]art and parcel of a larger contractual relationship between CA and Ingres created by the Divestiture Agreements, and therefore must be understood within the context of that larger framework. . . . Indeed, as this case shows, the [later agreement']s plain terms do not reveal where it begins and the [earlier agreement] ends. . . . witnesses described the [later agreement] as a gap-filler that picked up where the [earlier agreement] left off.

*Id.* at *47.  Thus, the court's decision to "give a consistent reading to interrelated agreements" was grounded in the identical subject matter of the two contracts at issue (i.e., the parties' obligations before and after divestiture).  In finding that the plain terms of the later agreement were merely gap-fillers that governed divestiture where the prior agreements left off, the court concluded it was justified in treating the agreements as a single contract.  *Id.*

The facts of *Ingres* do not, however, provide support for reading the Sweep Rider and the PPP Note together.  While *Ingres* involved interrelated contracts whose overall aim was a single transaction, the Sweep Rider and PPP Note govern two separate and unrelated transactions: the Line of Credit and the PPP Loan.  *See* A165, A177.  The two documents have distinct purposes.  Five-Star executed the PPP Note to obtain "an emergency loan" from a program "that Congress was creating in response to the pandemic."  A162.  The Sweep Rider, on the other hand, expressly pertains to the Line of Credit and, critically, did not incorporate any future

loan agreements between PNC Bank and Five-Star. *See* A177. In *Ingres*, in contrast, the later agreement was intended to cover issues not addressed in the earlier suite of agreements, and therefore had the same purpose as those agreements – accomplishing the divestiture. *Ingres Corp.*, 2009 WL 4575009 at *14-15. *Ingres* accordingly does not require the PPP Note and the Sweep Rider to be read together.

Second, in *Cent. States, SE & SW Areas Pension Fund v. Kroger Co.*, 73 F.3d 727 (7th Cir. 1996), this Court reversed a determination that a master agreement and local supplement comprising a collective bargaining agreement should be read as separate agreements. *Id*. at 731. There, the master agreement expressly set forth the intention that the local supplement would be incorporated into the master agreement and made part of it. *See id*. The two agreements were executed at the same time, and the local supplement was physically attached to the master agreement when the documents were executed. *Id*. at 731-32.

None of these factors are present here. The Sweep Rider and PPP Note were executed at the different times (early March 2020 and late April 2020); the agreements were intended for different purposes (to provide for payments on a pre-existing loan and to create a new loan); and neither agreement incorporated the terms of the other. A177, A189-201. In view of those distinctions, and because the two documents related to separate and distinct transactions, *Kroger* does not mandate that the PPP Note and the Sweep Rider be read together.

(2) <u>The Plain Language of the PPP Note and the Sweep Rider Does Not Permit Them to be Construed Together</u>

The District Court acknowledged that the PPP Note did not expressly incorporate the terms of the Sweep Rider, but it construed this fact in a light most favorable to PNC Bank. The District Court noted that the Sweep Rider was "incorporated into and made part of . . . certain other financing documents and security agreements executed by and between Borrower and Bank," and concluded it must be construed together with the PPP Note. A5. That interpretation of the Sweep Rider, however, does not take into account the plain language of that contract. The Sweep Rider expressly relates <u>only</u> to the Line of Credit:

> This Working Cash Sweep Rider is <u>incorporated into and made a part of that certain Amended and Restated Revolving Line of Credit Note dated February 7, 2020</u>, as amended, restated or renewed from time to time (the "Note"), and also into certain other financing documents and security agreements executed by and between the Borrower and Bank (the Note together with all such documents are collectively referred to as the "Loan Documents") . . . . As long as this Working Cash Sweep Rider has not been terminated, the following (i) outlines the terms under which Bank will make advances under the Line of Credit. . .

A177 (emphasis added). This paragraph contains no reference to future loans, but rather expressly incorporates the agreement into the documentation of only one of the existing loans from PNC Bank to Five-Star, the Line of Credit. *Id*. The plain language also shows that the incorporation was not intended to apply to prospective

loan documents – only to existing ones.[6]  *Id*.  The PPP Note, which expressly
references the PPP program created by the CARES Act, does not incorporate or
reference the Sweep Rider, the Line of Credit, or any of the prior loans that Five-
Star received from PNC Bank.  A189-201.  The holding that the Sweep Rider and
the PPP Note should be read together is therefore not supported by the plain language
of either contract, and the District Court erred in dismissing Five-Star's breach of
contract claim on this basis.

(3) <u>The District Court's Dismissal of the Breach of Contract Claim Improperly
Credited An Affirmative Defense</u>

The District Court improperly relied upon an affirmative defense of PNC
Bank in holding that the Sweep Rider excused its conduct in taking the PPP proceeds
and applying them to the Line of Credit.  A5.  "Affirmative defenses do not justify
dismissal under Rule 12(b)(6); litigants need not try to plead around defenses."  *Doe
v. GTE Corp*., 347 F.3d 655, 657 (7th Cir. 2003); *see also Schmidt v. Skolas*, 770
F.3d 241, 248 (3d Cir. 2014).  Here, PNC Bank asserted in its motion to dismiss that
the Sweep Rider justified its breaches of the PPP Note.  A203, 208.  In response,
Five-Star articulated numerous reasons why the Sweep Rider should not be read
together with the PPP Note based on, among other things, the plain language of both

---

[6] Moreover, language contained in the PPP Note demonstrates that PNC Bank was perfectly able to
incorporate terms into agreements that might be executed in the future.  The PPP Note contains a provision
stating, in pertinent part, that "[n]otwithstanding any provision to the contrary in any Loan Document or
any other collateral security documents <u>that may have been or may in the future be executed and delivered
to the Bank</u>," the operative term would apply.  A191 (emphasis added).

documents.  A203.  Five-Star submits that the District Court incorrectly interpreted the intersection of these agreements, warranting reversal of its decision.

In *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391 (D. Del. 2014), the court declined to dismiss breach of contract claims in response to arguments by the defendants that the claims were time-barred by the terms of the agreement and because the plaintiff had not adequately alleged breach. *Id*. at 400.  The court determined that an adjudication of those defenses was inappropriate on a motion to dismiss:

> Both of these defenses involve contract interpretation by the Court, and therefore are more amenable to a determination at the summary judgment stage. . . . Because these questions involve disputed issues of fact and contract interpretation not suitable to resolution on a motion to dismiss, the Defendants' motion is denied with respect to the breach of contract claims.

*Id*.

Similar questions of fact and contract interpretation are present here.  For instance, Five-Star contends the PPP Note should be read to limit the application of the Sweep Rider, both because of the express reference to the provisions of the CARES Act and the manner in which loan proceeds were to be used.  Equally important, the Sweep Rider was not, as the District Court mistakenly concluded, incorporated into future agreements between the parties.  A177.  Based on their plain language, the interplay between these agreements is not sufficiently certain to provide PNC Bank with an affirmative defense that is plain from the face of the

18

Counterclaims.  For this additional reason, the District Court erred in dismissing Five-Star's breach of contract clam in reliance on the Sweep Rider.

C.     Five-Star Sufficiently Alleged that PNC Bank Breached the PPP Note

The District Court also erred in concluding that Five-Star failed to plead facts establishing a breach of the PPP Note based upon PNC Bank's sweep of two-thirds of Five-Star's PPP loan proceeds.  A6.  Five-Star alleged three breaches of the PPP Note arising from this conduct: (1) that PNC Bank failed to honor the deferral period; (2) that PNC Bank failed to provide available PPP funds at a 1% interest rate; and (3) that PNC improperly applied swept PPP funds to obligations not permitted under the CARES Act.  A167.  Consideration of each of those theories under applicable Delaware law and the language of the PPP Note demonstrates that Five-Star adequately pleaded a breach of contract claim.

With respect to the deferral period, the District Court held that because the sweep of the PPP funds was done "not to enforce the PPP Note but rather to collect amounts due under the line of credit," PNC Bank's actions did not constitute a breach of the PPP Note.  A6.  But a court must construe a contract as a whole, giving effect to all its provisions.  *Fla. Chem. Co. LLC*, 262 A.3d at 1080.  A reading of the contract must be reasonable "when read in full and situated in the commercial context between the parties"  *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 926-27 (Del. 2017).  The District Court's analysis did not

consider the PPP Note as a whole, situated in the relevant commercial context. The overarching purpose of the CARES Act, which the PPP Note explicitly references, was to make cash immediately available to businesses to meet payroll and other permitted expenses during a national emergency. A162. As demonstrated by the deferral period provision of the PPP Note, the intent of the transaction was to maximize the benefit of that immediately-available cash by eliminating any requirement that the borrower make payments that might reduce its liquidity during a period of urgent economic need. A189. Notwithstanding this commercial context referenced in the plain language of the PPP Note and known to PNC Bank, the bank seized PPP funds from Five-Star's account immediately upon disbursal, thereby reducing by more than half the liquid assets available to Five-Star during the deferral period. A165. In light of those facts pleaded in the Counterclaims and the provisions of the PPP Note, Five-Star adequately pleaded that PNC Bank breached the deferral period provision of the PPP Note under Delaware law.

With respect to the interest rate, the District Court concluded that, just because the sweep resulted in Five-Star having to borrow money at a higher rate, "the PPP funds themselves were not subject to a higher interest rate than provided in the PPP Note at any time." A6. Again, this conclusion does not follow the dictates of Delaware law that the interpretation of a contract must include consideration of the commercial context and the agreement as a whole. *Chi. Bridge & Iron Co. N.V.*,

166 A.3d at 926-27.  The PPP Note provides that interest on the obligation will accrue from the date of the note at 1% per annum.  A189.  That low rate is consistent with the overarching policy of the CARES Act, as referenced in the PPP Note and described above, to provide low-cost immediate liquidity to businesses during a national emergency.  A162.  Without that available cash – given that Five-Star's revenue dropped nearly to zero due to government-imposed lockdowns – Five-Star was essentially forced to choose between obtaining higher-cost available cash or furloughing employees.  A161.  Congress enacted the CARES Act to prevent businesses from facing precisely that conundrum.  A162.  Again, in light of those allegations describing the relevant commercial context and the applicable provisions of the PPP Note, Five-Star adequately alleged a breach of the interest provision of the contract.

Finally, the District Court disposed of Five-Star's allegation that PNC Bank breached the PPP Note by sweeping PPP funds to apply them to obligations not permitted under the CARES Act by stating simply that "the CARES Act had no effect on the contractual language."  A6.  Again, that holding fails to consider, as required under Delaware law, the plain language of the PPP Note and the commercial context.  *See Fla. Chem. Co. LLC*, 262 A.3d at 1080.  The PPP Note provides explicitly that "[t]his Note is being issued pursuant to the Coronavirus Aid, Relief, and Economic Security Act's (the "CARES Act") (P.L. 116-136) Paycheck

Protection Program." A189. In addition, the forgiveness provision of the PPP Note specifically references the CARES Act requirements, noting that "not more than 25% of the amount forgiven can be attributable to non-payroll costs." A189. As the District Court noted, the parties did not dispute that the PPP Note constituted a contract between PNC Bank and Five-Star, which imposed obligations on both parties "pursuant to" the CARES Act.[7] A189. Based on the text of the statute – which is cited in the PPP Note – a borrower was not permitted to receive the forgiveness benefits of the program and apply PPP funds to pre-existing debt. A189. As Five-Star alleged in the Counterclaims, Five-Star objected to PNC Bank's seizure of PPP funds for purposes not authorized in the CARES Act, but PNC Bank refused to reverse this seizure. A166. In light of those allegations of fact, and construing the plain terms of the PPP Note in accordance with the commercial context, Five-Star adequately alleged a breach of PNC Bank's obligation to comply with the CARES Act in connection with the PPP Note. For this additional reason, the District Court's dismissal of Five-Star's breach of contract claim should be reversed.

---

[7] Notably, the District Court held that PNC Bank was entitled to "enforce its contract to the letter," but provided no explanation why Five-Star should not be permitted to enforce the PNC Bank's obligations to provide funds "pursuant to" the CARES Act under the PPP Note, rather than seize those funds immediately to repay itself. A5.

D.    The District Court Erred in Dismissing Five-Star's Fraud Claim, Because Five-Star Adequately Alleged the Element of Reliance

The District Court erred in concluding that, because Five-Star had signed the Sweep Rider and was presumably familiar with its terms, it could not have reasonably relied on statements made by PNC Bank prior to the execution of the PPP Note.  A9.  Delaware authority provides that a plaintiff's knowledge concerning an alleged misrepresentation is a question of fact that should not be resolved on a motion to dismiss for failure to state a claim.  *See Genesis Health Ventures, Inc. v. Goldman, Sachs & Co.*, 355 B.R. 438 (Bankr. D. Del. 2006).  Because Five-Star pleaded both specific misrepresentations as well as facts establishing its justifiable reliance on PNC Bank's representations notwithstanding the existence of the Sweep Rider, its fraud claim against PNC Bank should survive.

In *Genesis Health*, certain investors brought an action against, among others, the chief financial officer of a Chapter 11 debtor, alleging fraud and other claims. *Id*. at 442-43.  The defendants, in seeking to dismiss the fraud claims, argued that the information the plaintiffs alleged was either fraudulently concealed or misrepresented was already known, or should have been known, by the plaintiffs. *Id*.  The court rejected this argument, noting that "[w]hether Plaintiffs were actually aware of these manipulations . . . is an issue of fact that cannot be considered at this stage when the Court is obliged to accept Plaintiffs' allegations as true.  . . . For now

it is sufficient that Plaintiffs have claimed that they acted in reliance on Defendants' representations, and were unaware of the concealed manipulations." *Id.*

Here, Five-Star alleged numerous facts that established justifiable reliance on PNC Bank's statements concerning the PPP Loan, and that Five-Star was unaware that PNC Bank would sweep PPP funds to apply them to the Line of Credit. First, Five-Star alleged that the PPP Loan was made in the context of a national emergency, and that the application process was "mass confusion and frustration," "plagued with problems from the start," and "just a mess." A162. Five-Star also alleged that PNC Bank offered to steer Five-Star through the application process, noting that it wanted to provide Five-Star with "every advantage to process your request [for a PPP loan] as quickly as possible." A163.

Second, Five-Star expressly pleaded that it "relied upon PNC Bank's expertise in the areas of banking and finance to understand the PPP rules and requirements, and to complete quickly an application for funding." A163. As set forth in the Counterclaims, Five-Star relied on PNC Bank-provided information about the PPP Loan funding, asking PNC Bank's representative when the PPP funds would be available, because the company had recently had to spend cash to make payroll for employees that otherwise would have been furloughed. A164-165. PNC Bank invited Five-Star's reliance by making statements – which later proved false – that

funds to pay employees would be in Five-Star's account "on Monday" and that they would be available for payroll and expenses.  A165.

Finally, Five-Star alleged that it was not aware that PNC Bank would sweep the PPP loan proceeds pursuant to the Sweep Rider, and did not realize until later than the funds had been swept and applied to the Line of Credit.  A165.  As with the allegations in *Genesis Health*, Five-Star's allegations that it lacked knowledge about how PNC Bank would apply the Sweep Rider in connection with the PPP Loan suffice to allege the element of reliance in support of a fraud claim.  *See Genesis Health*, 355 B.R. at 460.

As alleged in the Counterclaims, practical considerations concerning the unique status of PPP funds made Five-Star's reliance on PNC Bank's statements reasonable.  Unlike the numerous loans that PNC previously extended to Five-Star, the PPP Loan was a distinctly different obligation.  It was issued not in the context of private commerce, but rather was an emergency loan made pursuant to a national statutory scheme enacted by Congress.  A189.  As stated in the PPP Note's opening paragraph, such loans were given "pursuant to the Coronavirus Aid, Relief, and Economic Security Act's (the 'CARES Act') (P.L. 116-136) Paycheck Protection Program."  A189.  The loan was unusual in that, so long as its proceeds were used as directed, some or all of the indebtedness would never have to be repaid.  A189.  On its face, the PPP Note stipulated that forgiveness would only be possible so long

as "[n]ot more than 25% of the amount forgiven can be attributable to non-payroll costs."  Five-Star therefore reasonably believed that PNC Bank would not jeopardize a significant special benefit of the PPP program – total loan forgiveness – by seizing the funds to be applied in a manner not intended by Congress.  A189.

Moreover, the Sweep Rider's terms could be modified, amended, or waived by a writing signed by PNC.  A182.  This contractual clause demonstrates that future writings between the parties could change the scope of the Sweep Rider.  Five-Star reasonably understood that the PPP Note – which provided funds granted by Congress to be used for certain enumerated expenses – modified the application of the Sweep Rider.  Five-Star was further justified in understanding that the PPP Note stood apart from the Sweep Rider because, while the Sweep Rider was expressly incorporated into its prior loan documents, its terms were not incorporated into future agreements with PNC.  A177.

In dismissing Five-Star's fraud claim, the District Court cited an opinion issued by this Court, applying Delaware law, for the proposition that there cannot be actionable fraud without reasonable reliance, and "reliance cannot be reasonable when it presupposes a failure to read clear language."  A9 (*citing Kennedy v. Venrock Assocs.*, 348 F.3d 584, 592 (7th Cir. 2003)).  This authority is distinguishable.

The *Kennedy* case involved an action brought by common shareholders of an insolvent corporation for, among other claims, securities fraud.  *Kennedy*, 348 F.3d

at 591-93. Central to plaintiffs' claims was the allegation that the corporation's directors issued a misleading proxy statement, by which plaintiffs allegedly were deceived into agreeing to reincorporate the company in Delaware. *Id*. at 591. The company previously had been organized under Maryland law, which purportedly provided plaintiffs with greater protections, as certain actions taken by the board would have required a two-thirds majority vote rather than a simple majority pursuant to Delaware law. *Id*. at 591-92.

The Seventh Circuit, in analyzing the statements contained in the proxy document, concluded that "there was no fraud, at least no actionable fraud, regarding the reincorporation. . . . [t]he proxy statement contained more than 20 pages on the differences between Maryland and Delaware law, and specifically mentioned that transactions that require a supermajority in Maryland can be approved in Delaware by a simple majority." *Id*. at 592. The court determined that a fraud claim cannot stand absent reasonable reliance, and concluded that "reliance cannot be reasonable when it presupposes a failure to read clear language." *Id*.

The scenario presented in *Kennedy*, however, is not analogous to this case. There, upon review, the allegedly misleading document contained an explicit explanation of the very risks of which the plaintiffs complained. Here, however, Five-Star's belief that PNC Bank would not immediately sweep the lion's share of the PPP proceeds from its operating account, when the PPP funds were granted by

Congress in the midst of a national emergency, was not contradicted by any plain language contained in either agreement. Accordingly, Five-Star reasonably understood that the language of the PPP Note modified or otherwise waived application of the Sweep Rider, particularly given that PNC Bank's representative assured Five-Star that the funds would be available for payroll and other permissible uses. A165.

The District Court also based its determination that Five-Star failed to state a fraud claim against PNC Bank on the proposition that courts are "especially reluctant to set aside contracts based on reliance on external representations when the parties are sophisticated businesses, like both PNC and Five Star." A9. In support of this finding, the District Court relied upon *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555-56 (Del. Ch. 2001). That case, however, is also distinguishable from the facts here. In *Pharmacia*, the plaintiff, Great Lakes Chemical Corp. ("Great Lakes"), purchased a subsidiary unit of the defendant pharmaceutical company. *Id*. at 545. In deciding to purchase the unit, Great Lakes engaged an industry consultant as well as the law firm Kirkland & Ellis to conduct due diligence and advise it on the proposed sale. *Id*. Following a negotiation that spanned nearly six months, the sale closed and Great Lakes obtained the unit for $125 million. *Id*.

28

After the sale, Great Lakes brought a variety of claims against seller, including a claim for fraud.  The misstatements alleged by Great Lakes pertained to a phone call with representatives of the seller prior to closing, in which the representatives stated that the declining sales of certain pharmaceutical products were related to a build-up of excess inventory for one of its customers, as well as a temporary slow-down in demand.  *Id*. at 547.

The seller-defendant sought dismissal of Great Lakes' fraud claims on grounds that the purchase agreement between the parties contained numerous anti-reliance disclaimers that barred any claim of justifiable reliance on the alleged misrepresentations.  *Id*. at 551-52.  The court agreed, noting that the case involved "two highly sophisticated parties, assisted by industry consultants and experienced legal counsel" who had "carefully negotiated disclaimer language after months of extensive due diligence."  *Id*. at 555.  The court concluded that, had it permitted Great Lakes' fraud claim based on external representations of the seller notwithstanding the carefully-drafted and negotiated anti-reliance provisions, the purchase agreement "would not be worth the paper it was written on."  *Id*. at 555-56.

Here, however, is a completely different scenario.  Five-Star alleged in the Counterclaims that it is a small business that was assisted by its trusted banking partner to obtain emergency funding under a new federal program.  A163.  Five-Star

also alleged that the requirements of the PPP program were confusing, and that the logistics of the program required Five-Star to "act fast . . . because the funds available were limited and distributed on a first-come, first-served basis." A162. Five-Star did not retain a consultant or a large global firm to represent it in this transaction as Great Lakes did. *See Great Lakes Chemical Corp.*, 788 A.2d at 545. Unlike Great Lakes, Five-Star did not have the benefit of months of diligence and careful negotiations. *See id.*; A162-A163. Accordingly, *Great Lakes* does not support the dismissal of Five-Star's fraud claims.

Moreover, the PPP Note contains no anti-reliance disclaimer. Delaware courts, when determining whether to dismiss a common-law fraud claim at the pleading stage based on an extra-contractual misstatement, consider whether the contract contained a plain anti-reliance provision. *See Blattman v. Siebel*, 2016 WL 1450946, at *3 (D. Del. Apr. 12, 2016) (*citing Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004)) (holding that, for a contract to bar a fraud claim, "it must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contracts four corners in deciding to sign the contract"). Here, the PPP Note does not contain any anti-reliance disclaimer. Five-Star therefore never agreed that, in entering into the PPP Note, it was not relying on PNC Bank's pre-contractual

statements.[8]    Five-Star thus reasonably relied on assertions by PNC Bank's representative that the PPP loan proceeds would be available in its account for payroll and not immediately swept to repay the Line of Credit.  A165.  The dismissal of Five-Star's fraud claim should therefore be reversed.

## VI.    <u>Conclusion</u>

For the reasons set forth above, Appellant Five-Star Audiovisual, Inc. respectfully requests that the Court reverse the Order of the District Court dismissing its Counterclaims against PNC Bank for breach of contract and fraud, remand this case to the District Court for further proceedings, and grant such other and further relief as the Court deems proper and just.

Dated: October 2, 2023

/s/ *Paige M. Willan*
KLEHR HARRISON HARVEY
BRANZBURG LLP
Paige M. Willan
Christopher J. Leavell
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Email: pwillan@klehr.com
Email: cleavell@klehr.com

*Counsel for Defendant-Appellant*
*Five-Star Audiovisual, Inc.*

---

[8] The inclusion of an ordinary integration clause is not enough to disclaim a potential fraud claim. *See id*. ("The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed it was not relying on facts outside the contract, will not suffice to bar fraud claims").

## CERTIFICATE OF COMPLIANCE WITH
## F.R.A.P. RULE 32(a)(7), F.R.A.P. RULE 32(g) AND C.R. 32(c)

The undersigned counsel of record for the Defendant-Appellant, Five Star Audiovisual, Inc., furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with a proportionally spaced font.

The length of this brief is 7,570 words.

Dated: October 2, 2023

/s/ *Paige M. Willan*
KLEHR HARRISON HARVEY
BRANZBURG LLP
Paige M. Willan
Christopher J. Leavell
1835 Market St. Ste.  1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Email: pwillan@klehr.com
Email: cleavell@klehr.com

*Counsel for Defendant-Appellant*
*Five-Star Audiovisual, Inc.*

## CERTIFICATE OF COMPLIANCE WITH
## F.R.A.P. RULE 25(d) AND C.R. 25

As the undersigned counsel of record for the Defendant-Appellant, Five Star Audiovisual, Inc., I hereby certify that this brief and appendix were delivered to counsel for Plaintiff-Appellee in accordance with F.R.A.P. 25(c)(2) and C.R. 25 by the Court's electronic filing system upon the following:

William S. Weltman, Esq.
Michael Patrick Yingling, Esq.
Reed Smith LLP
10 S. Wacker Drive, 40th floor
Chicago, IL 60606
Email: wweltman@reedsmith.com
Email: myingling@reedsmith.com

Dated: October 2, 2023

/s/ *Paige M. Willan*
KLEHR HARRISON HARVEY
BRANZBURG LLP
Paige M. Willan
Christopher J. Leavell
1835 Market St. Ste. 1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Email: pwillan@klehr.com
Email: cleavell@klehr.com

*Counsel for Defendant-Appellant*
*Five-Star Audiovisual, Inc.*

33

<u>**CERTIFICATE OF COMPLIANCE WITH C.R. 30**</u>

As the undersigned counsel of record for the Defendant-Appellant, Five Star Audiovisual, Inc., I hereby certify that, in accordance with Seventh Circuit Rule 30(d), Defendant/Appellant Five-Star Audiovisual, Inc, an Illinois corporation, certifies that the short appendix attached to this brief and the appendix filed contemporaneously herewith contain all the materials required by Seventh Circuit Rule 30(a) and (b).

Dated: October 2, 2023

/s/ *Paige M. Willan*
KLEHR HARRISON HARVEY
BRANZBURG LLP
Paige M. Willan
Christopher J. Leavell
1835 Market St. Ste. 1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Email: pwillan@klehr.com
Email: cleavell@klehr.com

*Counsel for Defendant-Appellant*
*Five-Star Audiovisual, Inc.*

No. 23-2402

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

FIVE-STAR AUDIOVISUAL, INC., an Illinois corporation,

Appellant,

*v.*

PNC BANK, NATIONAL ASSOCIATION, a National
Bank Association and PNC EQUIPMENT FINANCE, LLC,
a Delaware limited liability company,

Appellees.

---

Appeal from Memorandum Opinion and Order of the Hon. Virginia M. Kendall, United States District Judge, Granting Plaintiffs'/Counter-Defendants' Motion to Dismiss Amended Counterclaims, Case No. 1:21-cv-05419 (United States District Court for the Northern District of Illinois, Eastern Division)

---

## APPELLANT'S SHORT APPENDIX
## PURSUANT TO C.R. 30(a)

---

**APPELLANT'S SHORT APPENDIX**
<u>**TABLE OF CONTENTS**</u>

| Tab Number | Document Title/Description | Page(s) |
|---|---|---|
| 1. | Memorandum Opinion and Order | A1-10 |

# TAB 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PNC BANK, N.A., and PNC EQUIPMENT FINANCE, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | No. 21 C 5419 |
| v. | ) ) | Judge Virginia Kendall |
| FIVE-STAR AUDIOVISUAL, INC., | ) ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

 Plaintiffs PNC Bank, N.A. and PNC Equipment Finance, LLC (collectively, "PNC") lent millions of dollars to Defendant Five-Star Audiovisual, Inc. In a February 2020 contract, Five-Star agreed that any balance in its checking account would be used to automatically pay off a separate line of credit taken out. A few months later, Five-Star secured a loan from the federal government to cover expenses related to the COVID-19 pandemic and deposited $2.9 million dollars into its checking account. PNC "swept" some of the funds out of the checking account to pay down the line of credit pursuant to the earlier agreement.

 PNC later sued Five-Star for breach of contract, alleging that Five-Star failed to repay certain loans. Five-Star initially counterclaimed for breach of the duty of good faith and fair dealing. PNC moved to dismiss for failure to state a claim, and this Court granted the motion without prejudice. Five-Star then filed an amended counterclaim alleging breach of contract, unjust enrichment in the alternative, negligence, negligent misrepresentation, fraud, and setoff. PNC once again moves to dismiss the counterclaims for failure to state a claim. (Dkt. 81). For the following reasons, PNC's motion is granted. (*Id.*)

1

A1

## <u>BACKGROUND</u>

Five-Star is an Illinois corporation that provides audiovisual services and equipment for business and entertainment events. (Dkt. 70 ¶¶ 7, 9). Over the course of the four years leading up to the COVID-19 pandemic, Five-Star took out loans and lines of credit totaling over $7 million from PNC, a national bank headquartered in Pennsylvania. (*Id.* ¶ 16). One of those lines of credit, executed on February 7, 2020, ("The Line of Credit") authorized cash advances up to $2,750,000 to Five-Star, with interest payments due monthly and the outstanding principal and accrued interest due upon expiration of the Line of Credit on February 4, 2021. (*Id.* ¶¶ 18–21).

After Five-Star's controller met with PNC in February 2020 to discuss changes to Five-Star's commercial checking account with PNC, Five-Star executed a "Sweep Rider" agreement. (*Id.* ¶ 40; Dkt. 70-1). The Sweep Rider provided that when the balance in Five-Star's commercial checking account exceeded a specified amount, PNC would automatically debit funds to pay debts accrued under the Line of Credit. (Dkt. 70 ¶ 41). Under the terms of the Sweep Rider, "any Final Available Balance in the [Five-Star checking account] shall be automatically applied to the repayment of the outstanding principal balance of the Line of Credit." (Dkt. 70-1 at 4). The Sweep Rider also provided that if the balance in Five-Star's checking account dropped below zero, PNC would make an advance under Five-Star's Line of Credit to return the checking account balance to "an amount equal to the lesser of (a) the amount necessary to bring the balance in the [checking account] to zero dollars … , and (b) the amount, if any, available under the Line of Credit." (*Id.* at 3).

After PNC and Five-Star entered into the Sweep Rider, they discussed the Paycheck Protection Program ("PPP"), an emergency loan initiative enacted by Congress is response to the COVID-19 pandemic. (Dkt. 70 ¶ 22). Under the PPP, small and medium-sized business could

2

A2

receive emergency funding, some of which would be forgivable if used for purposes such as maintaining payroll and paying for health care benefits, rent, mortgage obligations, and utilities. (*Id.* ¶¶ 23, 29, 34). Five-Star worked with PNC to complete the application. (*Id.* ¶ 32). Five-Star was approved for a PPP loan, and PNC disbursed $2,906,800 into Five-Star's corporate operating account on April 20, 2020, after the parties had executed a loan agreement (the "PPP Note"). (*Id.* ¶¶ 45, 49).

That same day, PNC "swept" $1,857,394.90 in PPP funds from Five-Star's operating account to pay off the balance on the Line of Credit, leaving $1,049,405.00 remaining in Five-Star's operating account. (*Id.* ¶¶ 50, 51). Five-Star was unaware that the sweep of approximately two-thirds of its PPP funds had occurred, and by June 17, 2020, it had spent all its remaining PPP funds. (*Id.* ¶¶ 52, 53). Five-Star began to draw additional funds from the Line of Credit to continue covering expenses that it had intended to cover using funds from the PPP loan. (*Id.* ¶ 53). While the PPP loan funds were subject to a one percent interest rate and a deferral period during which Five-Star was not obligated to make any loan payments, the Line of Credit on which Five-Star had to draw was subject to a higher interest rate and did not provide a deferral period. (*Id.* ¶¶ 54, 55).

By September 22, 2020, Five-Star had maxed out the Line of Credit. (*Id.* ¶ 56). On October 13, 2021, PNC filed suit against Five-Star for breach of contract, seeking to recover all outstanding debts owed to it by Five-Star, including those due under the Line of Credit. (*Id.* ¶ 59; Dkt. 1). On January 21, 2022, Five-Star filed a counterclaim alleging breach of good faith and fair dealing. (Dkt. 27). This Court dismissed Five-Star's counterclaim with leave to amend. (Dkt. 60). Five-

Star filed its amended counterclaim on October 21, 2022. PNC moves again to dismiss for failure to state a claim. (Dkt. 81).

## LEGAL STANDARD

A complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (cleaned up). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (cleaned up) (quoting *Iqbal*, 556 U.S. at 678).

## DISCUSSION

Five-Star brings a six-count counterclaim for (1) breach of contract, (2) unjust enrichment, (3) negligence, (4) negligent misrepresentation, (5) fraud, and (6) setoff.[1] (*See generally* Dkt. 70). The Court considers each claim in turn.

## I.    Breach of Contract (Count I)

"[A] plaintiff asserting a breach of contract claim must plead: (1) the existence of a valid and enforceable contract; (2) defendant's breach of contract; and (3) damages resulting from the

---

[1] Although PNC disagrees that Delaware law applies (instead of Illinois), it acknowledges—and the Court agrees—that "the applicable law is not determinative of the issues." (Dkt. 92 at 2 n.2).

breach." *Raquet v. Allstate Corp.,* 348 F. Supp. 3d 775, 781 (N.D. Ill. 2018); *see also Tani v. FPL/Next Era Energy*, 811 F.Supp.2d 1004, 1023 (D. Del. 2011). Here, the parties only debate whether Five-Star sufficiently alleged a breach in its amended counterclaim. It has not.

As a threshold matter, while the PPP Note did not expressly incorporate the terms of the Sweep Rider, the Sweep Rider itself was "incorporated into and made part of … certain other financing documents and security agreements executed by and between Borrower and Bank," (Dkt. 70-1 at 1), and the Sweep Rider applied to the same operating account into which the PPP funds were deposited.[2] Therefore, the related contracts are read together. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 731 (7th Cir. 1996) ("[W]e see no reason why we should depart from the basic rule that related documents must be read together."); *CA, Inc. v. Ingres Corp.*, No. 4300-VCS, 2009 WL 4575009, at *47 (Del. Ch. Dec. 7, 2009) ("Traditionally, courts try to give a consistent reading to interrelated agreements.").

Viewed together, the terms of the Sweep Rider permitted PNC's sweep of the PPP funds, and nothing in the PPP Note limited the continued applicability of the Sweep Rider to funds deposited in Five-Star's operating account. Five-Star argues that, to the extent any ambiguity is created by the "intersection of the provisions," it should not be decided at the motion-to-dismiss stage. (Dkt. 84 at 7 n.1). The existence of an unambiguous contract between the parties authorizing the exact conduct does not, however, create any uncertainty. The outcome might be harsh—but PNC is entitled to enforce its contract to the letter. *See Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 475 (Del. Ch. 2022).

---

[2] "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). Here, the existence of the Sweep Rider, which was attached as an exhibit to Five-Star's counterclaims, controls.

5

Notwithstanding the clear language, Five-Star argues that PNC breached the terms of the PPP Note in three ways: (1) by failing to honor the deferral period that the PPP Note provided for, (2) by failing to provide the PPP funds at a one percent interest rate, and (3) by applying the swept funds to uses not permitted by the CARES Act. (Dkt. 70 ¶¶ 34, 54; Dkt. 84 at 5–6). None carry the day. First, PNC's sweep of the account on the day the PPP funds were deposited was not done the enforce the PPP Note but rather to collect amounts due under the Line of Credit. Second, although PNC's sweep of the PPP funds resulted in Five-Star's needing to draw additional funds from the Line of Credit at a higher interest rate, the PPP funds themselves were not subject to a higher interest rate than provided for in the PPP note at any time.[3] Finally, the CARES Act had no effect on the contractual language. Five-Star cannot point to a specific section of the law that invalidated the Sweep Rider. Nor does a general provision of the PPP Note invalidate the agreed-upon contract.

## II.     Unjust Enrichment (Count II)

Unjust enrichment occurs when the defendant unjustly retained a benefit to the plaintiff's detriment, and the retention of that benefit is "against the fundamental principles of justice or equity and good conscience." *In re Verizon Insurance Coverage Appeals*, 222 A.3d 566 (Del. 2019); *see also HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). A plaintiff, however, cannot recover for unjust enrichment when there is an express contract between the parties. *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012) ("It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust

---

[3] Similarly, Five-Star's argues, as to its negligence count, that it was exposed to "the risk that the PPP loan would not be eligible for forgiveness." (Dkt. 70 ¶ 81). Even if this risk constituted a breach, Five-Star must also plead damages resulting from that breach. "Merely showing that a contract has been breached without demonstrating actual damage does not suffice … to state a claim for breach of contract." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007). Five-Star has not alleged that PNC's sweep of the PPP funds caused it, for example, to become ineligible for forgiveness of its PPP loan, so it has failed to state a claim on this alleged breach of contract as well.

enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim.") (citing *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del.1979)).

The parties here clearly formed a contract by executing the Sweep Rider, so Five-Star cannot recover under an unjust-enrichment theory. Despite the clear existence of a contract, Five-Star maintains that its unjust enrichment counterclaim should not be dismissed because "PNC itself questions whether the PPP Note is the exclusive measure of Five-Star's rights." (Dkt. 84 at 10). It is true that an unjust-enrichment claim can survive where the validity of the contract is in doubt or the contract was entered into based on wrongdoing or mistake. But Five-Star has not alleged that the Sweep Rider is an invalid contract or that the "claim is premised on an allegation that the contract arose from wrongdoing (such as breach of fiduciary duty or fraud) or mistake."[4] *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, No. CV-12067-VCG, 2018 WL 1559936, at *16 (Del. Ch. Mar. 28, 2018). The Sweep Rider's validity is undisputed, and there are no questions about implied promises or claims arising outside the express provisions of Five-Star and PNC's contracts.

## III.    Negligence and Negligent Misrepresentation (Counts III & IV)

To state a claim for negligence or negligent misrepresentation, Five-Star must establish that PNC owed it a duty of care and breached that duty of care resulting in measurable damages. *Hudson v. Old Guard Ins. Co.*, 3 A.3d 246, 250 (Del. 2010). Five-Star asserts that PNC breached

---

[4] Five-Star points to two Delaware cases in which unjust enrichment claims survived motions to dismiss. Both are distinguishable. In *Lyons Ins. Agency, Inc. v. Kirtley*, the Delaware Superior Court determined that there were still material facts in issue as to the validity and enforceability of an employment agreement between the parties. 2019 WL 1244605, at *2 (Del. Super. Mar. 18, 2019). And in *LVI Grp.*, the Delaware Chancery Court found the defendants had adequately pled that the parties' merger agreement was entered into based on the defendant's fraud. 2018 WL 1559936, at *17. Unlike those cases, there is no dispute over the validity of the Sweep Rider, a contract which the parties entered into before the PPP Note and which mandated PNC's sweeping of the checking account balance,.

a duty to "provide accurate information regarding the opaque and novel PPP application process." (Dkt. 84 at 11). Although the parties' business relationship is rooted in contracts, "a claim for economic loss may be pursued in tort as well as contract where … the claim is founded on a duty of care that the law imposed on the defendant irrespective of the terms of the contract." *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 617 (7th Cir. 2001). Under Delaware law though, an interested party to a contract only owes a duty not to provide *false* information regarding a transaction. *See, e.g.*, *Livery Coach Sols., LLC v. Music Express/E., Inc.*, 245 F. Supp. 3d 639, 646 (D. Del. 2017); *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del. Super. 1990).

Here, PNC never provided false information to Five-Star and, thus, did not violate its duty of care. PNC only informed Five-Star about the PPP program, recommended that it seek a loan through the federal government, and assisted the company in the process. Five-Star protests that the process was "opaque and novel," (Dkt. 84 at 11), but that problem lies with the federal government, the program's creator. Moreover, Five-Star could access everything through publicly available sources. The lender itself "does not have a duty to disclose facts which are 'readily available from other sources.'" *MB Fin. Bank, N.A. v. Planet Airways, Inc.,* No. 04 C 0893, 2005 WL 1189597, at *2 (N.D. Ill. May 4, 2005) (citing *Continental Bank, N.A. v. Everett*, 760 F. Supp. 713, 718 (N.D. Ill. 1991). Finally, the fact that the Sweep Rider, signed just weeks prior to the execution of the PPP Note, remained operative was known by Five-Star. PNC had no duty, then, to disclose the signed and agreed-to document.

## IV.    Fraud (Count V)

The elements of common law fraud are "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to

act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).[5] For the fourth element, the plaintiff must establish that justifiable reliance on the defendant's representation. *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992).

Five-Star did not reasonably rely on PNC's oral statements about the benefits of the PPP loan. Five-Star executed the Sweep Rider shortly after its controller met with Five-Star's contact at PNC in February 2021. (Dkt. 70 ¶¶ 36–40). Then, a few months later, Five-Star executed the PPP Note. (Dkt. 70 ¶ 45). Although PNC did not refer to the terms of the Sweep Rider in the course of the parties' discussions about the terms of the PPP Note, Five-Star certainly was aware that it had just recently agreed to the Sweep Rider, which mandated the sweep of funds from its commercial checking account. Five-Star overlooks the significance of the already-existing terms of the Sweep Rider, as "[t]here is no actionable fraud without reasonable reliance, and reliance cannot be reasonable when it presupposes a failure to read clear language." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 592 (7th Cir. 2003). Moreover, courts are especially reluctant to set aside contracts based on reliance on external representations when the parties are sophisticated businesses, like both PNC and Five-Star. *See Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544 (Del. Ch. 2001). Five-Star may regret not opening a new checking account to separate its PPP funds, but a contract cannot be invalidated because it was a bad bargain for one side.

---

[5] Fraud claims require a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "[A] complaint must specify the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990).

**V.      Setoff (Count VI)**

A "setoff" is a "counter demand which defendant holds against plaintiff, arising out of a transaction extrinsic of plaintiff's cause of action." *Madison M. Gray v. Hitchens Bros., Inc.*, No. 1987-11-020, 1989 WL 848982, *2 (Del. Ch. July 19, 1989). Because Five-Star has failed to state a claim for any of its counterclaims, there is no setoff.

## <u>CONCLUSION</u>

For these reasons, PNC's motion to dismiss Five-Star's counterclaim is granted. (Dkt. 81). Because the Court already granted Five-Star leave to amend its counterclaims, they are dismissed with prejudice.

Virginia M. Kendall
United States District Judge

Date: June 16, 2023